# IN THE UNITED STATE DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHRISTY JACKSON** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **TEMPLE UNIVERSITY HOSPITAL, INC.** | : | **No. 09-386** |

## MEMORANDUM OPINION

**Goldberg, J.**　　　　　　　　　　　　　　　　　　　　　　　　　　　　**November 30, 2010**

Plaintiff, Christy Jackson, has alleged that Defendant, Temple University Hospital, Inc. ("Temple Hospital"), terminated her employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII") and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981").[1] She contends that her termination was motivated by her race, African American, and was in retaliation for a letter she sent to Temple University's Office of Affirmative Action detailing the allegedly discriminatory behavior of her supervisor.

Before the Court is Defendant's Motion for Summary Judgment. Because Plaintiff has failed to adduce sufficient evidence to demonstrate: (1) a prima facie case of race discrimination or that her termination was pretextual; or (2) that her termination was causally connected to the letter she sent to Temple University, Defendant's motion will be granted.

---

[1] Plaintiff is no longer pursuing a claim under Title I of the Americans with Disabilities Act, 42 U.S.C. 12111 et seq., ("ADA"). (Pl.'s Br. at 1 n.1.)

1

I.      **FACTUAL & PROCEDURAL HISTORY**

Unless otherwise indicated, the facts discussed below are undisputed.[2] Temple University Health System, Inc. (hereinafter "TUHS"), is the parent corporation of Defendant, Temple Hospital, a teaching hospital with two locations in Philadelphia, Pennsylvania. Plaintiff began working at Temple Hospital in 1998 as a secretary in the Department of Respiratory Care. Her duties included answering telephones, setting up home-care oxygen supplies, typing, assisting with payroll, ordering medical supplies and generating reports. At all times relevant to this litigation, she directly reported to John Mullarkey, Director of Respiratory Care. (Def.'s State. Facts, ¶¶ 1-6; Mullarkey Depo., p. 7.)

In the last six months of 2006, TUHS suffered operating losses of $31,650,000. Temple Hospital incurred losses of $9,898,000 during the same period. In order to reduce operating costs, TUHS's Chief Operating Officer informed the Senior Management Team at Temple Hospital that there would be a reduction in force ("RIF"). In January 2007, Temple Hospital began the process of compiling names of positions that could be eliminated. Sandra Gomberg, Associate Hospital Director, asked divisional leaders, including Cecilia Pemberton, Administrative Director of the Lung Center, to identify positions that had no impact, or at most, a minimal impact on patient care. Thereafter, Pemberton asked Mullarkey to identify positions within the Respiratory Care Department

---

[2] In response to a number of the paragraphs in Defendant's Statement of Undisputed Facts, Plaintiff asserts that "she possesses no facts contrary to or in support of those alleged . . . and therefore cannot deny or admit the allegations[.]" See (Pl.'s Resp. Def.'s State. Facts, ¶¶ 21-26, 30, 34, 38-42, 57-60, 96, 98.) At this stage in the litigation and absent a motion for further discovery pursuant to Federal Rule of Civil Procedure 56(f),we do not consider Plaintiff's unsubstantiated responses to create a factual dispute for the purpose of our analysis. Waris v. HCR Manor Care, 2009 WL 330990 at *1 n.2 (E.D.Pa. Feb. 10, 2009); see also Robin Construction Co. v. U.S., 345 F.2d 610, 613 (3d Cir. 1965).

that met this criterion and which involved job duties that could be assumed by existing employees. (Def.'s State. Facts, ¶¶ 16-18, 26-27.)

At the time, the Respiratory Care Department had approximately 50 employees, including respiratory therapists, supervisors, one equipment technician and one secretarial position. Mullarkey selected Plaintiff's secretarial position and the equipment technician position for possible elimination. He testified that he "couldn't lay off anybody with a [state certification in respiratory care] . . . [s]o he gave [Pemberton] the name of the two positions that weren't credentialed[.]" (Mullarkey Depo., pp. 8-9.) Defendant contends that by mid-January 2007, after a "two-way conversation" with Mullarkey, Pemberton recommended that Plaintiff's secretarial position be eliminated, while retaining the equipment technician position. Pemberton testified that the secretarial position had the least impact on patient care and that the department had the ability to absorb Plaintiff's duties. (Pemberton Depo., pp. 16-17; Def.'s State. Facts, ¶¶ 8, 29.)

Defendant contends that Gomberg accepted and approved Pemberton's recommendation in mid-January and on January 29, 2007, Plaintiff's name and position were included on an initial completed template of Temple Hospital's "Remediation Plan," which was sent to TUHS's corporate human resources department. Plaintiff's name was also included on all subsequent revised templates. The RIF was officially implemented on February 16, 2007, whereby approximately 450 positions were eliminated system-wide. At Temple Hospital, 34 positions, including Plaintiff's, were eliminated. After the RIF, the four managers in the Respiratory Care Department assumed Plaintiff's duties. (Def.'s State. Facts, ¶¶ 10, 35-36, 39, 59-60.)

Plaintiff claims that she was terminated on the basis of her race and in retaliation for a letter she mailed to Temple University's Office of Affirmative Action on February 2, 2007, which alleged

3

discriminatory conduct in the Department of Respiratory Care. In support of her claim of racial discrimination, Plaintiff points to comments allegedly made by Mullarkey, which she described in her February 2, 2007 letter and deposition. Specifically, she alleges that:

- In September 2004, Mullarkey told her that he could change the fact that she was off on Martin Luther King, Jr., Day, but after seeing she was upset, he "laughed nervously and added, 'Oh I guess *you* would want to keep *that* Holiday, huh?'" (Def.'s State. Facts, Ex. 9 at 8) (emphasis in original);

- In 2004, Mullarkey commented that "those people in the neighborhood that we worked in[,] Temple, of course, being in the heart of North Philadelphia[,] . . . just can't seem to get it together . . . the Irish did it, we did it, why can't they?" (Jackson Depo., pp. 71, 73);

- In 2004, Mullarkey noted that Plaintiff could play music at her desk, as long "as it wasn't that rap shit[,]" (id. at 79);

- In 2004, after she told Mullarkey that Malcolm X's father was murdered by the Ku Klux Klan in Lansing, Michigan, the location of a Respiratory Care conference, Mullarkey asked another supervisor if she would like to go to the conference, and noted "I hear it's a great place to live. [Plaintiff] said it's a great place to live[.]"[3] (id. at 82-83);

- On January 31, 2007, Plaintiff overheard Mullarkey saying that "*they* said that the

---

[3] Plaintiff also testified that subsequent brochures for the conference in Lansing, Michigan, were tacked to a bulletin board behind her work station "a couple of times," as late as 2007. (Jackson Depo., pp. 85-86.) She did not know, however, who tacked the brochures on her board. (Id. at 85-87.)

4

- NBRC (National Board of Respiratory Care) was racially biased back then and gave *them* lower test scores . . . but *my* friends and I went out and drinking the night before our exam and we were hung-over and *still* passed the exam[,]" (Def.'s State. Facts, Ex. 9 at 9) (emphasis in original);

- At "the end of January" 2007, in response to Plaintiff describing an allergy and sinus problem she was having, he said "What's that they have in the city? Let me see now . . . yes, rats and cockroaches! They cause allergies!" (Jackson Depo., p. 94; Def.'s State. Facts, Ex. 9 at 8); and

- At an unspecified time, Plaintiff asserts that after Mullarkey mentioned a "football player or it could have been a basketball player . . . [who] had been accused of having relations with a Caucasian women" and doing "something very negative in the media's eyes," he "smacked" her on the arm and said, "that's going to be your son one day[,]" (Jackson Depo., pp. 112-13).

Plaintiff also contends that, as a general matter, "[t]here was a lot of Irish versus black conversations that [Mullarkey] tried to draw [her] into. Always smears, you know, slurs against blacks. Why can't blacks do this, why can't black -- why can't some people? Why? . . . I mean, those conversations were so -- there was too many to count." (Jackson Depo., pp. 116-17.) She specified that these comments were "on and off" throughout her employment at Temple Hospital, but were made numerous times. (Id. at 117.)

Plaintiff is not aware of any race-related comments attributable to Gomberg, Pemberton, or any other supervisor, administrator, or manager at Temple Hospital. (Def.'s State. Facts, ¶¶ 92-94.)

5

## II. SUMMARY JUDGMENT STANDARD

According to Federal Rule of Civil Procedure 56(c), summary judgment is proper "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. A "[p]laintiff cannot simply reassert factually unsupported allegations in his pleadings." Poles v. St. Joseph's Univ., 1995 WL 542246 at *5 (E.D.Pa. Sep. 11, 1995) (citing Celotex, 477 U.S. at 325).

## III. PLAINTIFF'S RACE DISCRIMINATION CLAIM

Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). Section 1981 prohibits racial discrimination in the making or enforcing of public and private contracts.[4] Under either statute, claims based upon circumstantial evidence of

---

[4] Section 1981 provides that "all persons within . . . the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]"

discrimination, such as those presented by Plaintiff, are governed by the familiar burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Pamintuan v. Nanticoke Memorial Hosp., 192 F.3d 378, 386 (3d Cir. 1999).

Under the McDonnell Douglas framework, the plaintiff bears the initial burden of establishing a prima facie case of race discrimination. Sherrod v. Philadelphia Gas Works, 57 Fed. App'x 68, 73 (3d Cir. 2003). If plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the unfavorable treatment. McDonnell Douglas, 411 U.S. at 802. Once the defendant comes forward with such a reason, plaintiff must demonstrate by a preponderance of evidence that the articulated reason was merely a pretext for intentional discrimination. Id. at 804.

### A. Prima Facie Case of Discrimination

To make out a prima facie case of race discrimination, Plaintiff must demonstrate that she: (1) is a member of a protected class; (2) was qualified for her position; (3) suffered an adverse employment action; and (4) suffered the adverse action under circumstances that give rise to an inference of discrimination. Brown v. Boeing Co., 468 F. Supp. 2d 729, 735 (E.D.Pa. 2007). However, where the plaintiff is terminated during an RIF, as was the case here, the fourth element becomes whether the employer retained similarly situated employees not within Plaintiff's protected class. Smith v. Thomas Jefferson University, 2006 WL 1887984 at *3 (E.D.Pa. Jun. 29, 2006).

Defendant does not dispute that Plaintiff can satisfy the first three elements of her prima facie case. However, it contends that she is unable to demonstrate that Temple Hospital retained similarly situated employees outside of her protected class because she was the only clerical employee within the Respiratory Care Department. Plaintiff responds that Defendant's argument impermissibly

7

narrows the focus of our analysis. She urges that we consider whether clerical employees, outside of her protected class, were retained in other departments under the control of RIF decisionmakers, Pemberton and Gomberg.

The fourth element of a prima facie case is intended to be flexible and "must be relaxed in certain situations, as when there is a reduction in force." Pivirotto v. Innovation Systems, 191 F.3d 344, 357 (3d Cir. 1999) (quoting Torre v. Casino, 42 F.3d 825, 831 (3d Cir. 1994)). With this policy in mind, we conclude that it would be inappropriate to reject Plaintiff's claim simply because she was the only secretary in her department. Cf. Sosky v. International Mill Service, Inc., 1996 WL 32139 at *6 (E.D.Pa. Jan. 26, 1996) ("If a plaintiff is in a unique position that is eliminated, that plaintiff must still have some way of making out a prima facie case; otherwise, the ADEA could not reach an employer who eliminates a unique position[.]")

Plaintiff does not, however, point to any evidence that non-Black clerical employees were retained following the RIF in other relevant departments, (Pl. Br. at 7), and our review of the documentation associated with the RIF does not demonstrate that this was the case. See (Omberg Decla., Ex. C - Ex. F; Pemberton Depo. Pp. 24-25.) Indeed, although Plaintiff contends that, "[c]learly, non-Black clerical employees were retained in departments within the jurisdiction of Ms. Pemberton and Ms. Gomberg[,]" (Pl's Br. At 7), she does not provide a citation to the record and Defendant's RIF materials do not indicate the racial composition of the clerical employees in these departments after the RIF. Thus, Plaintiff cannot sustain her initial burden of establishing a prima facie case of race discrimination. For the sake of completeness, we will also address the remaining steps of the McDonnell Douglas analysis.

8

### B. Legitimate, Nondiscriminatory Reason

Accepting that Plaintiff has established a prima facie case, the burden of production shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its decision. Defendant's burden is "relatively light" at this stage, and it need only "introduc[e] evidence which, if taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Defendant asserts that Plaintiff's position was eliminated, along with thirty-three other positions, in connection with a RIF that was implemented as a cost-cutting measure to offset system-wide operating losses. (Def.'s Br. at 8; Def.'s State. Facts, ¶¶ 16-18, 26, 36.) Defendant further asserts that it sought to eliminate positions that had no impact, or at most, a minimal impact on patient care. (Def.'s State. Facts, ¶¶ 26-27.) We have no difficulty concluding that Defendant has tendered a facially legitimate, nondiscriminatory reason to satisfy its burden.

### C. Pretext

To survive summary judgment, Plaintiff must point to evidence from which a fact-finder could reasonably conclude that Defendant's proffered reason is pretextual. Fuentes, 32 F.3d at 763. This can be accomplished by adducing evidence from which a fact-finder could: (1) disbelieve the employer's articulated reason; or (2) believe that discrimination was more likely than not a motivating or determinative cause of the employer's action. Id. at 764. Plaintiff focuses on the second approach.[5]

---

[5] In her response, Plaintiff does not present argument or identify facts which suggest the Defendant's articulated reason is unworthy of credence. (Pl.'s Br. at 7) ("Defendant is correct that Ms. Jackson relies upon derogatory statements made by Mullarkey to establish pretext.") Although she contends that elimination of the equipment technician would have resulted in a lesser impact on patient care than elimination of her position, (Pl.'s Resp. Def.'s State. Facts, ¶

Plaintiff contends that statements made by her direct supervisor, John Mullarkey, establish a genuine issue of material fact as to pretext. (Pl.'s Br. at 7-8.) Defendant responds that these statements are stray remarks unrelated to the decisionmaking process and are therefore insufficient to defeat summary judgment. We agree with Defendant.

The United States Court of Appeals for the Third Circuit has observed that, in the employment discrimination context, "stray remarks by non-decisionmakers or by decisionsmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992). Nevertheless, "statements temporally remote from the decision at issue, may be properly used to build a circumstantial case of discrimination." Abrams v. Lightoiler, Inc., 50 F.3d 1204, 1214 (3d Cir. 1995). In addition to considering the status of the speaker and the temporal and substantive remoteness of the alleged statements from the adverse employment decision, courts within the Third Circuit have also considered the purpose and the content of the statements in determining if they are sufficient to support a pretext finding.[6]

---

31), her disagreement with Pemberton and Gomberg in this respect does not demonstrate such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 764-65 ("[T]he plaintiff cannot merely show that the employer's decision was wrong or mistaken, since the factual issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.")

[6] Parker v. Verizon Pennsylvania, Inc., 309 Fed App'x 551, 558-59 (3d Cir. 2010); see Keller v. Ortix Credit Alliance, Inc., 130 F.3d 1101, 1111-12 (3d Cir. 1997) (holding comment of supervisor was insufficient to survive summary judgment where it occurred "four or five months" prior to termination, did not refer to question of whether he should be retained or fired and did not necessarily suggest he could not perform job due to his age); Connolly v. Pepsi Bottling Group, LLC, 347 Fed. App'x 757, 761 (3d Cir. 2009) (holding that statements of decisionmakers lacked probative force to prevent summary judgment where "comments [did] not

Initially, we conclude that there is sufficient evidence to allow a jury to reasonably conclude that Mullarkey "influenced or participated" in the decisionmaking process. See Abramson v. William Patterson College of New Jersey, 260 F.3d 265, 286 (3d Cir. 2001) ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate"). In connection with the RIF, Mullarkey was tasked with identifying positions within the Respiratory Care Department for possible elimination and had at least one conversation with one of the RIF decisionmakers regarding his recommendation. (Def.'s State. Facts, ¶ 9.) Thus, evidence as to whether Mullarkey harbored discriminatory animus is relevant to determining whether race motivated the Defendant's decision to eliminate Plaintiff's position. See Abramson, 260 F.3d at 286. However, in evaluating such evidence, we cannot ignore the fact that Mullarkey did not have authority to make final decisions regarding the RIF and that his recommendations were subject to rejection by both Pemberton and Gomberg.[7] See (Def.'s State. Facts, ¶¶ 26-29) (reflecting that

---

all suggest potential age-related bias, and those that might were made months before defendant's decision to terminate plaintiff and outside the context of that decisionmaking process"); Weirich v. Horst Realty Co., LLC, 2009 WL 838532 at *7 (E.D.Pa. Mar. 26, 2009) (holding comments could support finding of pretext, considering the declarant's position, the "temporal connection" between statement and alleged discrimination, and "the purpose and content of the statement"); Adeni v. Vertex, Inc., 2007 WL 2728845 at **4-5 (E.D.Pa. Sep. 18, 2007) (holding decisionmaker's comments were insufficient to survive summary judgment, because court was unaware of the remarks having discriminatory connotations and they occurred five years prior to plaintiff's termination).

[7] See Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 348, 358-59 (3d Cir. 1999) (holding company founder's comment that women were "unreliable employees because they could become pregnant or get breast cancer" was insufficient because comment was outside decision process and founder, although having the "final word" on employment decisions, "simply ratified" decision to terminate plaintiff); Jakimowicz v. City of Philadelphia, 2010 WL 2649890 at *5 (E.D.Pa. Jun. 30, 2010) (finding comment that "You whites ran this prison for a long time. Now we Blacks run it, and when I give you an order, no matter what it is, you will carry that out" by individual who recommended that plaintiff be demoted, but that did not have final decisionmaking authority, was insufficient to support pretext finding).

11

Pemberton rejected his recommendation to eliminate the equipment technician position).

Considering Mullarkey's role in Defendant's decision, we find that the comments relied upon by Plaintiff fail to raise a genuine issue of material fact as to pretext. The remarks that he allegedly made in the weeks surrounding the decision are unrelated to the employment action at issue and contain little, if any, discriminatory animus. Mullarkey's alleged January 2007 comment that "they" have "rats and cockroaches" in the "city," which cause allergies, is racially neutral on its face and Plaintiff has not offered an explanation or interpretation that convinces us that it was reflective of race or racially derogatory. (Jackson Depo., pp. 96-97) (explaining that comment was "ignorant" and unprofessional and noting that the "laughter" that followed the comment "was indicative of a slur or a joke"). In addition, Mullarkey's remark on January 31, 2007 regarding racial bias in the National Board of Respiratory Care exam, while implicating race, is insufficient to sustain a pretext finding. This comment is unrelated to Plaintiff's job performance, her status as an employee of Temple Hospital, and the decision to eliminate her position.[8]

---

[8] Compare Keller v. Orix Credit Alliance, 130 F.3d 1101, 1111-12 (3d Cir. 1999) (holding that comment four or five months before termination that "*If you are getting too old for the job*, maybe you should hire one or two *young* bankers" could not be reasonably viewed as sufficient to prove by a preponderance of the evidence that age was a determinative cause of plaintiff's termination) (emphasis in original); with Weirich v. Horst Realty Co., LLC, 2009 WL 838532 at *7 (E.D.Pa. Mar. 26, 2009) (holding that one of the decisionmaker's comment that she "does not want someone *like that* at her front desk" and that plaintiff "didn't present the image that she wanted" was sufficient to support pretext finding because a jury could find that the comments implicated plaintiff's disability and suggest her termination as a front desk clerk was more likely than not motivated by the disability); Kerns v. Drexel University, 2008 WL 2876590 at **13, 17 (E.D.Pa. Jul. 24, 2008) (holding that an African American supervisor's statement that "[t]he brothers are running the place down here now" and that "he's got some friends who need work," coupled with evidence that the declarant told plaintiff's immediate supervisor to "keep a close eye on [plaintiff]" was sufficient, along with other evidence, to connect the alleged racial animus to the disciplinary actions at issue); Wilsbach v. Filene's Basement, Inc., 1997 WL 805164 at **4, 7 (E.D.Pa. Dec. 31, 1997) (holding that decisionmakers' comments that plaintiff, a former security guard, was "too old to chase a suspect," expressing concern over company's

The other specific comments Plaintiff attributes to Mullarkey were allegedly spoken over two years before the employment decision at issue. Thus, as a matter of law, each are individually insufficient to defeat summary judgment. See e.g., Wimberly v. Severn Trent Services, Inc., 2007 WL 666767 at *5 (E.D.Pa. Feb. 26, 2007) (holding that seven month period between decision and lone decisionmaker's comment insufficient to establish pretext). Further, although stray comments, when viewed together, may be used to build a circumstantial case of discrimination, we conclude that Plaintiff cannot do so here.

Mullarkey's alleged comments from 2004 were isolated and temporally removed from his 2007 comments and the decision to eliminate her position. Their probative value is further attenuated by the fact that none of the comments were substantively related to an employment decision of any kind.[9] See Pineda v. Philadelphia Media Holdings LLC, 542 F. Supp. 2d 419, 426 (E.D.Pa. 2008) ("Plaintiff may not rely on [supervisor's] alleged racist statements to establish pretext since Plaintiff has failed to meet his burden of proving that these statements were in anyway related to any of Defendant's employment decisions, either temporally or otherwise.") Further, not all of the comments suggest discriminatory animus, and those that might reach that level are not even in the same category as remarks that courts within this district have rejected as insufficient. This is true

---

image "if customers were to see [plaintiff] running, chasing shoplifters, and possibly having a heart attack" and that he was "'too old' for his job" was enough); Thompson v. Air Products and Chemicals, Inc., 1997 WL 66192 at *1 (E.D.Pa. Feb. 10, 1997) (holding that a decisionmaker's remark, upon handing plaintiff her notification of termination, that he had "no place in [his] organization for a person like you" was sufficient, given plaintiff was the only African American employee in the department at the time).

[9] This is also true of Mullarkey's alleged comparison of Plaintiff's son to a black athlete. Given that the subject and timing of the comment is somewhat vague, we consider it to be of only minimal value in supporting a reasonable finding of pretext. Indeed, neither Plaintiff nor Defendant even mention this comment in their motion papers or statements of undisputed fact.

even in light of Mullarkey's alleged 2007 comments and the vague, general allegation that he would draw her into "Irish versus black" conversations "on and off" throughout her employment. (Jackson Depo., pp. 116-17); see Ezold v. Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 546-47 (3d Cir. 1992) (holding one sexist comment before the hiring of plaintiff and six allegedly sexist comments in the next five years by direct supervisor who took part in partnership decision, but left firm before "final votes and evaluations" was insufficient); Connolly v. Pepsi Co. Bottling Co., 347 Fed. App'x 757, 759 n.2, 760-61 (3d Cir. 2009);[10] Moulouad v. Temple University, 2007 WL 2972595 at **1, 3 (E.D.Pa. Oct. 9, 2007) (holding that statement of decisionmaker eleven months before decision that plaintiff "had two strikes against [him] at University. A, that he was [not white] and B, he had an accent" was insufficient); Rose v. Woolworth Corp., 137 F. Supp. 2d 604, 607, 610 (E.D.Pa. 2001) (holding that decisionmaker's comments referring to the black community as a baby factory, stating that blacks are incapable of thinking analytically, and warning Plaintiff not to talk to white women was insufficient, because there was no evidence that the "comments were linked,

---

[10] In Connolly, a panel of the Third Circuit recently affirmed the district court's grant of summary judgment on a plaintiff's age discrimination claim, where plaintiff offered evidence that two individuals involved in the decision to terminate him said, between about a year and five months of his termination: (1) that plaintiff "was the old man in the group," (2) "Listen, old man, I know you're lying to me;" (3) that plaintiff was a "legacy liability;" (4) that "the job has passed [him] by" and that "younger key account managers can work rings around [him];" and (5) that he did not "fit the mold for a trainer." 347 Fed. App'x 757, 759 n.2 (3d Cir. 2009). The plaintiff also offered evidence of an age notation on his personnel file, which indicated that the individuals involved in the termination decision were aware of his age. Id. at 760-61. The court held that the comments of the two decisionmakers "do not all suggest potential age related bias, and those that might were made months before defendant's decision to terminate plaintiff and outside of the context of that decisionmaking process." Id. The court determined that these statements and the age notation lacked sufficient probative force in light of the undisputed facts related to the stated basis for his termination, namely that plaintiff improperly authorized the use of funds from customer accounts for the personal use of another employee.

14

temporally or otherwise, to the decision to fire Plaintiff"). Cf. Logan v. Countrywide Home Loans, 2007 WL 879010 at **2, 8, 12 (E.D.Pa. Mar. 15, 2007) (considering "general allegation" that two individuals related to decision process "regularly" called him "old," told him he "needed to hang it up," asked if he was "getting tired of the game" and made reference to their ability to "buy a manager at half [his] cost" was insufficient, together with specific age-related comments).

We conclude, therefore, that Plaintiff has failed to provide sufficient evidence to allow a jury to reasonably conclude that discrimination was more likely than not a determinative or motivating factor in Defendant's decision to eliminate her position.

## IV. PLAINTIFF'S RETALIATION CLAIM

Plaintiff also claims that she was retaliated against in violation of Title VII. To establish a Title VII retaliation claim, an employee must prove that: (1) she engaged in protected activity; (2) her employer took an "adverse employment action after or contemporaneous with the protective activity[;]" and (3) a causal link exists between the adverse action and the protected activity. Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007) (citing Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001)). Thus, "[i]f the employer is not aware of the protected activity, there can be no charge of retaliation." Brown v. Boeing Co., 468 F. Supp. 2d 729, 737 (E.D.Pa. 2007).

Plaintiff claims that she was terminated in retaliation for a February 2, 2007 letter that she mailed to an affirmative action officer at Temple University's Office of Affirmative Action. She also emailed the letter to the same officer on February 5, 2007. It is undisputed, however, that Gomberg accepted Pemberton's recommendation to eliminate Plaintiff's position in mid-January 2007 and that Plaintiff's name appeared on the initial template of potential employment positions to be eliminated, which was sent to TUHS's corporate human resources department on January 29,

2007. (Def.'s State. Facts, ¶¶ 56-61.) Since there is no evidence that the decisionmakers in this case knew of her protected activity before or contemporaneously with their decision to eliminate her position, Plaintiff is unable to establish a causal link between the two events.

In reaching this conclusion, we reject Plaintiff's attempts to manufacture a material, factual issue by pointing to Pemberton's inability to recall the date when she recommended Plaintiff's position be eliminated and her unfamiliarity with the initial template that was sent to TUHS. Regardless of Pemberton's testimony, there is no evidence of record that contradicts Gomberg's statement that she approved Pemberton's recommendation to eliminate Plaintiff's position in mid-January 2007. Further, we simply do not agree that Pemberton's unfamiliarity with the template "suggests that [it] was created after the date reflected on the document." (Pl.'s Br. at 9.) Temple Hospital's human resource leaders completed the template using the information provided to them by relevant decisionmakers. (Def.'s State. Facts, Ex. 1, ¶¶ 8-12.) Thus, the fact that Pemberton did not recognize the document at her deposition is not surprising and in no way suggests that the date on the document is incorrect.

Because Plaintiff cannot establish a causal connection between her alleged protected activity and Defendant's decision to eliminate her position, we conclude that her retaliation claim must be dismissed.

**IV.   CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment shall be granted, and Plaintiff's claims shall be dismissed. Our Order follows.